William O. Culbertson, Sr. v. Commissioner. Gladys Culbertson v. Commissioner.
Culbertson v. Commissioner
Docket Nos. 4184, 4185.
United States Tax Court
1950 Tax Ct. Memo LEXIS 133; 9 T.C.M. (CCH) 647; August 2, 1950
Benjamin L. Bird, Esq., and Y. D. Harrison, Jr., Esq., for the petitioners. J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion This case comes back to us upon mandate for further proceedings in conformity with the opinion of the Supreme Court of the United States, 337 U.S. 733. We, therefore, proceed as required by the mandate. In the light of that opinion we have re-examined and re-studied the record, including all evidence before us. We have taken additional evidence, upon the application of the petitioner, and the parties have again briefed the issues. In addition to the facts heretofore found, which by reference are adopted here, we find, after taking additional evidence, as *134 follows: Findings of Fact There was no written agreement of partnership in October or November 1939 between petitioner and his sons. The conversation with Coon about buying him out was in October, and petitioner talked to the boys, except Richard, within the next day or two. At the time the boys gave the petitioner the note for $49,720 on November 6, 1939, petitioner did not give much thought to whether the boys could pay the note off within a year. He did not give it any thought at all as to whether he intended gifts to the children. R. S. Coon wished to prepetuate the Coon and Culbertson herd. R. S. Coon had an affection for the Culbertson boys. He left, by will, some money for Joe Jack and Eugene for school purposes. The Culbertson boys were very enthusiastic about the cattle proposition. After the deal with Coon, the business went right on as it had been before, petitioner continuing to look after the office and finance, etc., and W. O., Jr., continuing to act as foreman. After W. O. Culbertson & Sons was organized, W. O., Jr., sat in on the policymaking, he with his brothers and father setting the policies. W. O., Jr.'s salary, duties and actual labor were the same after *135 the formation of Culbertson & Sons as before, but his attitude towards the business was different. The most important matters were taken up with the boys. W. O., Jr., was foreman and overseer. He handled practically all the advertising, though advertising was discussed by all. He wrote and received a great many letters on behalf of the firm, by which he meant W. O. Culbertson & Sons, during 1940 and 1941. He bought groceries and purchased feed after an agreement between him and the others as to the amount and kind of feed to be bought. He bought some considerable part of the feed, which amounted to $12,494.69 in 1940 and $15,726.18 in 1941. A problem arose as to whether the other brothers should go to school, and it was decided that they do so "and get what they could out of schooling to apply on the partnership; in other words, whatever they could learn that would help the partnership later, would be more beneficial towards the partnership than their actual services at that time * * *." The work and responsibility was divided. The petitioner and all of the boys discussed the feeding policy. They also had the problem of handling registered cattle, also some commercial cattle that were *136 purchased, and of breeding to the best advantage. W. O., Jr., had charge of and handled most of the breeding program. It was handled at the ranch. The petitioner offered suggestions occasionally. Joe Jack and Eugene also participated what time they were there. The petitioner and the boys who were there, when they could all get together, decided on the selling policies, and W. O., Jr., participated in some sales. The petitioner did the principal part of the contacting of buyers and selling. W. O., Jr., went with him when some cattle were bought and participated to some extent in purchasing and selling. W. O., Jr., never, during 1940-1941, purchased cattle where he signed the check. There was mutual agreement among the parties as to purchasing. The other brothers never bought or sold any cattle individually. Richard, while on a furlough, made delivery of one sale of 1,436 cattle. W. O., Jr., was there when the cattle were delivered; his father was not. The check for the cattle was received in the office of W. O. Culbertson & Sons at Dalhart. Richard did not know whether his father was present at that time. During 1940 and 1941 W. O., Jr., wrote five checks on the bank account of Culbertson *137 & Sons in the following, respective, amounts: $29.23, $50.00, $10.00, $10.00, and $4.00. The bookkeeper usually handled the payment of debts, very often at the direction of W. O, Jr. During 1939, 1940, and 1941 debts so paid, at his direction, amounted to $13,219.16. W. O., Jr., employed and discharged the employees on the ranch during those years and, within the policy of Culbertson & Sons, determined the amount of their salaries. The employees averaged about six or seven throughout those years. During the taxable years the ranch used by Culbertson & Sons consisted of two tracts, the Baca Ranch of 41,845 acres and the Swoyer Ranch of 10,670 acres. The land was all leased and not owned by Culbertson & Sons. Since 1941 Culbertson & Sons has leased a ranch called Staley of 20,915 acres, and has purchased a ranch called McCrory of 31,666 acres. On December 12, 1949, W. O., Jr., lived with his family on the Baca Ranch, Joe Jack lived with his family at the Staley Ranch headquarters where he was in active charge, and Eugene lived with his family on the McCrory Ranch where he was in active charge. W. O., Jr., had active charge of the Baca and Swoyer ranches and is over-all manager of them. *138 Richard lives in Dalhart where he is owner of a half interest in a live stock commission company. About 1947 he sold out his interest in the alleged partnership, for approximately $80,000, to the petitioner and the other sons. In the spring of 1940 the petitioner wished to buy the Baca Ranch. He told the boys he could finance the matter and get an insurance loan. The price was about $5 an acre, but petitioner thought the land could be purchased for about $4.50 an acre. About 25,000 acres would have been purchased, the rest of the ranch being under lease. The boys did not favor the purchase. It was not made. Culbertson & Sons already had a lease on the property. During 1940 and 1941 Richard was either at Texas A. & M. or in the Army, at all times except for a short time in the summer of 1940 and a furlough in the latter part of 1941. He was at home at Christmas 1940. He was graduated from Texas A. & M. about the 7th of June 1941. The correct date of his entry into the Army is June 20, 1941. He got his degree and commission, and was ordered to report for duty, at the same time. He did not participate in the affairs of Culbertson & Sons even on the week-ends, except to the extent *139 of correspondence, and except for about 15 days during the summer of 1940. Eugene and Joe Jack participated on week-ends and during the summer vacations. The ranch is about 93 miles from Dalhart, and W. O., Jr., had contact with them when he was in town, which was about once every two weeks. There was no telephone communication between the ranch and Dalhart. In October and November 1939 Richard was in school. The first he heard about the formation of W. O. Culbertson & Sons was in a letter from his brother, W. O., Jr., to the general effect that Uncle Dick Coon intended to sell his one-half of the Coon-Culbertson interest to the brothers. The letter mentioned partnership and that the petitioner would furnish the money, and asked whether he wished in on the matter. The letter mentioned equal division. Richard wrote back and told W. O., Jr., to count him in. Later he signed a note. He was at home during Christmas vacation during 1939 and there was discussion of plans at that time. He had studied at school, marketing, finance, and modern animal husbandry. The feeding problem came up, and he suggested a program involving sweet feed. That program had good results. At that time they discussed *140 their commercial cattle, that is, cattle other than registered cattle, and they decided that the commercial business was good, but that they could not go into it at that time. Coon and Culbertson had established a commercial herd about 1936. Richard heard nothing mentioned about income taxes. In the early part of 1943 he first heard about the document dated December 8, 1939, drawn up by a lawyer named Stalcup for the petitioner. This knowledge was through a letter from his father, stating, among other things, that he advised the boys to try to get it straightened out by trying the matter in court, and to make the document invalid. He was released from the Army on December 6, 1943. He has, some part of the time since then, lived on one of the ranches and managed the commercial cows on it. He was in Colorado at the time of the first hearing. Joe Jack first heard of the partnership, W. O. Culbertson & Sons, when his father came to the ranch and told him and his brothers about Coon wanting to sell them his interest. That was while he was going to high school. Later he signed a note for about $49,000. He intended to pay his part. It was decided that he should learn something about bookkeeping, *141 so after school he would go down, though not every day, and work with the bookkeeper. During 1940 Joe Jack worked on the ranch about 169 days and Eugene worked about 153 days. During 1941 Joe Jack worked on the ranch about 84 days and Eugene about 148 days. Joe Jack received a salary of $30 or $35 a month when he was working during the summertime and after school on week-ends. Eugene received about the same. After the formation of Culbertson & Sons, books were set up. The date of the books was set back to November 1, 1939, when they finally got everything set up. [1] Since the beginning of Culbertson & Sons the bookkeeper has sent each of the boys a monthly statement of the business transacted during the month. The date of the first was October and November 1939. The statement shows the checks, all written by the bookkeeper, the amount, the person to whom payable, and what each check is for; also credits, expenditures, and bank deposits. Eugene first heard of the formation of W. O. Culbertson & Sons at the ranch. His father and W. O. Jr., were there. *142 His father told him that Uncle Dick Coon wanted to sell the boys his one-half interest in Coon & Culbertson. There was some talk about the brand they would use. It was Eugene's intention at the time he signed the note to pay it. He first heard of the document dated December 8, 1939, when petitioner explained it to him in 1943 at Dalhart. Eugene, while in Dalhart, helped on registration papers to be made out through the winter. He did not sign any applications for registration of cattle; they were signed by W. O., Jr. He helped make them out. He was in charge of about 250 bulls, kept about a mile sough of Dalhart. He saw them every day while they were there and did some of the feeding. They were kept there for sale and easy delivery. Eugene discussed the breeding program with his brothers, W. O., Jr., and Joe Jack. Their brood herd was all registered stock. The brothers decided upon cross-fencing to divide the pastures for better breeding purposes. This required the keeping of a pasture book, to which all contributed for 1940-1941, but it was all in the handwriting of W. O., Jr. The cows were divided into 16 groups in separate pastures. In 1940 there were about 600 registered calves *143 and about the same in 1941. W. O., Jr., signed most of the applications for registration. Joe Jack always had a hand in vaccinating the cattle for black leg. There was no set date for marketing registered cattle. The commercial cattle were usually marketed in the fall. Joe Jack and Eugene took care of keeping the ranch freed from a poison weed. Breeding of the cattle is highly important. W. O., Jr., Eugene, and Joe Jack directed the breeding, which produced a cow, which was the dam of a bull, which recently sold for $65,000, a world's record for the sale of any one animal. Joe Jack usually runs, on the Staley Ranch, about 800 to 1,000 head of cattle and takes care of all steer deliveries for Culbertson & Sons. In 1948 they sold about 2,500 steers. During the year 1940 the petitioner received from W. O. Culbertson & Sons no salary, and "dividends" of $840. W. O., Jr., received $1,200 salary and $210 "dividends." Richard received $20 salary and $272 "dividends." Joe Jack received $138 salary and $210 "dividends." Eugene received $94 salary and $210 "dividends." In 1941 the petitioner received from Culbertson & Sons no salary, $1,900 "dividends," and $365.78 "Payments for Account. *144 " W. O., Jr., received $1,200 salary, $600 "dividends," and $89.50 for "Payments for Account." Richard received no salary, $650 "dividends," and $38.57 for "Payments for Account." Joe Jack received $106.66 salary, $600 "dividends," and $58.15 for "Payments for Account." Eugene received $93.32 salary, $600 "dividends," and $58.15 for "Payments for Account." The advertisement inserted in the American Hereford Journal of December 15, 1939, by W. O. Culbertson, Jr., for W. O. Culbertson & Sons, contains as a heading the expression "The Coon & Culbertson Partnership," and again refers to dissolution of Coon & Culbertson partnership. It lists petitioner and his four sons and states, in part, "As we assume the new firm name shown at right [W. O. Culbertson & Sons], we assume also new responsibilities. The record made by the Coon & Culbertson partnership is one to reckon with in the future * * *." It nowhere refers to W. O. Culbertson & Sons as a partnership. An advertisement by W. O. Culbertson & Sons in the American Hereford Journal of June 15, 1940, also refers to Coon & Culbertson as a partnership, but nowhere refers to W. O. Culbertson & Sons as a partnership. An advertisement by W. *145 O. Culbertson & Sons in the Western Live Stock magazine of February 1941 makes no reference to partnership. The stationery of W. O. Culbertson & Sons does not refer to it as a partnership. Stationery used in 1940-1941 shows the names of the petitioner and the four sons. Under date of October 30, 1940, the Cattle Santitary Board of New Mexico wrote W. O. Culbertson & Sons, acknowledging receipt of a letter from one Stewart "regarding a brand for your cattle" and enclosed two applications, one for signature and return and the other to serve as a brand certificate until permanent certificate was mailed to them. The correct date of the letter from W. H. Coon to A. A. Wright, manager of National Finance Credit Corporation of Fort Worth, is October 23, 1939. When petitioner shortly thereafter came to talk to Wright, petitioner said he was "forming a partnership with his sons to take over his interest of the Coon and Culbertson cattle." Wright told petitioner that in case they handled a loan they wanted him to have authority to sign for the minors, and that he would extend a loan, be glad to, if petitioner would have his attorney draw a document giving petitioner the power to sign notes *146 or mortgages, that their attorney would accept, then he would take care of petitioner's loan. In testifying in the District Court of Dallam County in the proceeding where the instrument of December 8, 1939, was declared invalid, the petitioner stated, among other things, that he told Wright that he had a new partnership; that Wright said "you better get your partnership business in a form of writing whereby you will have the right to go on and borrow money. * * * You better get that in a form of writing, a common partnership"; also, that "I followed Mr. Wright's request - to get something in the form of a partnership so he could carry me, so he could carry my finances with him." A few days later petitioner produced the document dated December 8, 1939, and on the basis thereof Wright's company allowed Culbertson & Sons a line of credit and has been carrying it ever since. Petitioner has never come to Wright and told him that that document was null and void, and Wright did not, when he testified in this cause on November 12, 1946, know tha a district court in Texas had declared the document null and void. Petitioner had not told him. Wright's company had relied upon the instrument *147 as being authentic, and since that time it has been in his office and he has relied upon it as a basis for a line of credit to W. O. Culbertson & Sons. In a protest filed with the Internal Revenue Agent in Charge, with respect to the tax liability in this case, the petitioner stated, as follows: "This is in regard to Mr. Wright's conversation. Mr. Culbertson explained that he and his four sons were operating a cattle business in partners under an oral agreement whereupon Mr. Wright advised that before his loan company would make a loan to W. O. Culbertson and Sons, the partnership agreement would have to be reduced to writing." The letter from petitioner to W. O., Jr., informing him about the document dated December 8, 1939, stated that it "involved income tax some way or other." The notice of deficiency in this cause was mailed to the petitioner on December 17, 1943. The petitioner's income tax return for 1940 lists among deductions interest on indebtedness in the amount of $1,024.64, of which $987.91 is explained as "National Finance Credit Corporation of Texas, Fort Worth, Texas." The return for 1941 lists as a deduction interest of $4,437.84, of which $4,409.34 is explained *148 as "National Finance Credit Corporation of Texas, Fort Worth, Texas." The judgment of the District Court of Dallam County, Texas, dated March 27, 1944, recites, inter alia, that Fannie Culbertson became a member of the partnership by purchase from W. O. Culbertson, Sr., and his wife of a one-eighth interest on December 31, 1940, and that after that date the interests were changed by agreement of the parties so that each child, including Fannie, became the owner of an undivided one-sixth interest, and W. O. Culbertson and wife, together, became the owner of an undivided one-sixth interest; and that the court holds that the instrument dated December 8, 1939, was wholly void and ineffective and that W. O. Culbertson & Sons is a vaild co-partnership, consisting of W. O. Culbertson and wife, Gladys, W. O. Culbertson, Jr., Richard Culbertson, Joe Jack Culbertson, Eugene Culbertson, and Fannie Culbertson, with interests as above set forth. With respect to income tax liabilities for the taxable years, the petitioner and Gladys each made the following payments to the collector of internal revenue, second collection district of Texas, at Dallas, Texas, for the year 1940: March 10, 1941, $130.72; *149 July 26, 1941, $52.17; November 10, 1947, $599.90 (being $429.58 tax and interest to October 24, 1947 of $170.32). For the year 1941: On February 19, 1942, $1,142.55; on November 10, 1947, $9,277.07, leaving an outstanding balance of $2,425.58 which was duly discharged as follows: * * *
About September 4, 1947, and October 10, 1947, Forms 873 were filed with the collector, whereby the petitioner's children directed that the amounts of proposed overassessments on their behalf be credited on the 1940-1941 income tax deficiencies of the petitioners. It was not the intention of the petitioners and their sons, or any of them, in good faith to become partners in the cattle business during the taxable years 1940 or 1941. Opinion DISNEY, Judge: Under the facts which we have found, was there partnership within the purview of the applicable statutes and decisions? After discussion of the principles involved, the Supreme Court held that the case be remanded to us for decision as to which, if any, of the petitioner's sons "were partners with him in the operation of the ranch during 1940 and 1941. As to which of them, in other words, was there a bona fide intent that they be partners *150 in the conduct of the cattle business, either because of services to be performed during those years, or because of contributions of capital of which they were the true owners," as that term is defined in Helvering v. Clifford, 309 U.S. 331; Helvering v. Horst, 311 U.S. 112, and Commissioner v. Tower, 327 U.S. 280. In so deciding, we have not placed emphasis upon any one or more questions or principles involved, but have considered all of the evidence in the light of the opinion of the Supreme Court in this cause and those opinions to which it refers. We make decisive no circumstances nor combination of circumstances less than all, and set no objective standard but endeavor to ascertain the intent involved and whether the partnership is real, considering all of the facts indicated by the Supreme Court, the agreement, the conduct of the parties in executing it, their statements, their relationship, respective abilities and capital contributions, the actual control of income, the purposes for which it is used, the testimony of disinterested persons, and *151 all other facts adduced before us throwing light on the true intent of the parties as to whether in good faith they intended with business purpose to join together in the present conduct of a partnership. One element requiring examination in the determination of intent and reality in this matter is the comparison, on the one hand, between the petitioner's contention that there was, in connection with the bill of sale for a half interest in the cattle and the giving of a note by the sons, on November 4-6, 1939, an oral agreement of general partnership, and, on the other hand, the evidence of intent found elsewhere and in particular in a different instrument later executed by the petitioner and his wife on December 8, 1939 (and reiterated on December 31, 1940, in an instrument which makes it a part thereof), in substance, providing that the arrangement was one whereby the petitioner and his wife, as owners of the live stock, leases, and equipment, transferred a one-half interest to the sons "in order to establish with them a limited partnership," [2] in order to make provision for their welfare and to establish them in business as and when they arrived at the proper age to engage in *152 business, specifically providing, however, among "conditions and stipulations" that the sole, exclusive, and unrestricted "right and control and management," and right of sale of the property and to invest in the proceeds of sales, or from earnings, all without any consent from the sons, was reserved by the petitioner and his wife, if living, until the youngest son become 21 years of age, with no right of withdrawal, or sale, of any part of his interest by any son until that date. This instrument conveyed on its face a limited one-eighth interest to each son but reserved in the petitioners, until majority of the youngest child, such dominion, ownership and management of the cattle and business that the limited partnership therein provided does not, for Federal income tax purposes, in our opinion, meet the requirements expressed by the Supreme Court in its opinion herein, as requisite to taxation of profits to all partners. It is by the petitioners apparently recognized as inimical to their theory of partnership effective during the taxable years for tax purposes, and it was specifically set aside by procedure clearly collusive, at petitioner's suggestion, in the state court. *153 We note first in this connection that in a protest filed by the petitioner, W. O. Culberton, Sr., he stated with regard to the conversation with one Wright - which caused the execution of the instrument of December 8, 1939 - that Wright had advised him before his loan company would make a loan "the partnership agreement would have to be reduced to writing." Also in his evidence before the state court which set aside the instrument of December 8, 1939, W. O. Culbertson, Sr., testified that Wright had told him "You better get your partnership business in a form of writing whereby you will have the right to go on and borrow money" and again "You better get that in a form of writing - a common partnership," and that he followed Wright's request. Inasmuch as the writing of December 8, 1939, was the result of the conversation with Wright, it appears at once to have been intended as a reduction of the partnership agreement to writing. Moreover, Wright testified that Culbertson, when he came in to talk about obtaining a line of credit, stated that "he was forming a partnership with his sons to take over his interest of the Coon and Culbertson cattle * * *," and that he, Wright, suggested *154 nothing except that in case a loan was handled he wanted Culbertson to have authority to sign for the minors; that a few days later the document of December 8, 1939, resulted; and that on the basis thereof loans were made. It appears obvious that Wright did not by any means require the detailed instrument which was prepared on December 8, 1939. There is unreason in the suggestion that Wright knew of the alleged previous oral agreement of general partnership differing from that expressed in the document of December 8, 1939, yet because of the terms of the latter extended credit to Culbertson & Sons. Wright within one year thereafter lent large sums to them, for the partnership return for 1940 deducts $987.91 interest paid to his company. In 1941 he lent $60,000 to Culbertson & Sons. We are unable to believe that he or any other reasonable business man would make such loans knowing of such a previous general oral partnership agreement, and unrestricted ownership of cattle in the minor boys, as the petitioners contend for here. We think it beyond doubt that if Wright had been informed that minors were members of a partnership which was the actual owner of the cattle he would not have *155 lent the money, at least until a guardian had been appointed for them. A partnership agreement is voidable by a minor. Potter v. Florida Motor Lines, 57 Fed. (2d) 313; 43 C.J.S. 198; Ex parte Chan Hai, 11 Fed. (2d) 667. The boys did not sign the document of December 8, 1939. It, therefore, could give Wright no protection against the boys if, as the petitioner alleges, they had earlier acquired actual partnership interests, in the cattle. The fact that Wright's company was satisfied by the instrument shows clearly, in our opinion, that the instrument was considered by him to set up the only arrangement between the father and the sons. The petitioner is, in substance, asking us to believe that he and his attorney and Wright conspired to defraud Wright's employer by obtaining credit on a declaration contrary to facts known to all of them. We do not believe that either the petitioner nor his attorney went to such extent, and if we assumed, what we have no reason to believe, that Wright would take part in such a scheme, it is obvious that his self-interest would have prevented. No reason whatever appears why he should so act toward his employer. We here face, *156 in fact, a choice between a good faith general partnership formed in November, as argued by petitioner, and good faith in the representations made, contrary to such theory, in petitioner's statements, formulated by his attorney and accepted by Wright's company, as of December 8, 1939. Logic requires us to choose the latter, otherwise to regard all participants therein as guilty of fraud. We are, after much examination of the whole matter, of the opinion that petitioner and his attorney and Wright did not falsely represent the facts to Wright's company, but that the partnership was in fact one recognizing the ownership and control of the cattle in petitioners until the youngest minor became of age, in which they "reserve to themselves the sole and exclusive right and control and management" until such date, "* * * in fact to manage and control the property herein conveyed without restrictions * * *." Considering the evidence of oral agreement of partnership involving the bill of sale for the half interest in the cattle, and around the dates November 4-6, 1939, it was by no means definite. It demonstrated a bill of sale to the sons for the half interest in the cattle, and a note, but *157 the oral formation of partnership was in large part assumed to follow and sketchily evidenced. Thus, W. H. Coon, nephew and assistant to R. S. Coon, and who was present during the negotiations between Coon and Culbertson and witnessed the bill of sale from W. O. Culbertson to his sons, when asked whether a partnership between Culbertson and his sons was formed answered "That was my impression on delivery. I interpreted it as a partnership. They were the owners." Though W. H. Coon testified that R. S. Coon had, speaking to Culbertson, used expressions as to the boys taking his place, and continuing in his shoes, Walter Williams, also present at that conversation, recalled nothing said as to partnership but only as to sale of the cattle by Culbertson to the sons. Any idea that R. S. Coon required that a partnership be formed is not borne out by the evidence. The most definite statement in that regard, reported from him through W. H. Coon, is that he would sell "if they [referring to the boys] can take my place, if you will sell it to them, just like I sell it to you"; and in the same sentence and immediately preceding he had stated to Culbertson "You can go on with it with the assistance *158 of your boys." In fact, a little later asked to explain the statement about the boys "taking his place" W. H. Coon explains it that he (referring to R. S. Coon) would "step out, yes sir, and that would complete our liquidation." Called at the second hearing he stated that Culbertson was to take the boys in as partners at the same price he paid, but asked for the language, this, as at the earlier hearing, appeared as his own interpretation, and that Coon's statement was that the boys would step into his shoes. Moreover, if we assume that R. S. Coon required a partnership, the record does not indicate that it was the one contended for as orally formed early in November, rather than the highly restricted limited partnership referred to in the instrument of December 8, 1939. It is true that there is also evidence from W. O. Culbertson, Sr., and W. O. Culbertson, Jr., but it likewise touches upon the transfer of the cattle more than formation of partnership. Thus, W. O., Jr., mentions the fact that his father had said that Coon wanted the boys to own his interest in the cattle, that they were buying them, and that the name of the organization was discussed. The word "partnership" does *159 come in, but, in general, as a conclusion. W. O., Jr., says the boys were all in the "partnership" and that there was agreement that it would be handled as a company, as a partnership, with profits to be shared alike; also that if they bought the cattle they would go into a partnership. But inspection of the transcript of evidence shows that the expression "partnership" occurs in large measure in questions rather than in the answers of the witnesses; in other words, the references to partnership appear in the main either only in the questions or are in response to questions using the expression "partnership." Thus, after W. O., Jr., asked where the partnership agreement was made, had testified that he did not recall, he was re minded that he had testified that his brothers were at the ranch in the fall (of 1939) and was asked: "And you all arranged for a partnership at that time?" Yet his answer was only that that was the first discussion after Coon "had decided to sell his interest to us boys. My dad came out and we talked it over," with Eugene and Jack, "as I recall." Immediately thereafter again questioned: "Just what was said there about the creation of this partnership" his answer *160 again fails to mention partnership agreement, but discusses the desire of Coon to sell, that he was asked what he thought, and that "We talked it over later with what boys were there." He does say later, asked when the conversation as to organizing partnership took place, that he did not recall, but he knows they "discussed the matter providing we bought these cattle we'd go into such a partnership." W. O. Culbertson, Sr., asked whether while at the ranch he talked to either Joe, Jack or Eugene "about this" (financing) answered: "I feel sure that I did. I know I talked to them about it." Then, asked whether there was discussion about formation of a partnership, answers "There was." Question: "What was the discussion?" Answer: "As to what we'd call the co-partnership." He said that it was understood between him and Coon that the boys be taken in as partners, but unsupported by the language used this smacks of conclusion; for there is no evidence of designation by Coon of partnership, to say nothing of something different from that described in the document of December 8, 1939. W. O., Jr., also, asked whether his father discussed formation of partnership, answered "Yes," but, asked for *161 the conversation, speaks of Coon's wish that the boys own his interest, but not of the partnership. Later, in connection with the name to be taken, he used the expression "since all the boys were in the partnership." Joe Jack was asked: Q. Was it your undestanding, Joe Jack, that you were a real partner, that you were to stand your share of the losses and that you were entitled to your share of the profits? A. I was a partner and I was to stand my losses and profits. Examination of the entire testimony on this causes us to conclude that there is really little actual evidence from the minds of the witnesses themselves that there was an oral agreement of general partnership. In this connection, it is to be noted that the publicity given in the local newspaper, primarily to the dissolution of Coon & Culbertson, though it speaks of Culbertson & Sons as the name under which Culbertson and his boys will operate, says nothing about a partnership; and neither the stock certificate in American Hereford Association or any of the letterheads of Culbertson & Sons mention partnership. Though the W. O. Culbertson & Sons advertisement in the American Hereford Journal on December 15, 1939, three *162 times refers to Coon & Culbertson as a partnership, W. O. Culbertson & Sons is not so designated, though reference is made to its "firm name." Another advertisement in the same publication on June 15, 1940, refers to Coon & Culbertson as partnership, but does not so call W. O. Culbertson & Sons. In short, repeated written statements noticeably fail to designate the partnership. Again, the record shows that Wright was never informed that the December 8, 1939, instrument had by the District Court been held null and void, did not know it when he testified in this matter, and until that time (November 12, 1946) had continued to extend W. O. Culbertson & Sons credit in reliance on that instrument. Examination of this fact is revealing. The gist of petitioner's position here is that Wright required the document of December 8, 1939, in order that he might loan money to Culbertson & Sons. If we were to so assume, what of the situation when the document so required is invalidated by the District Court? The answer is that Wright would, under his own requirements, now logically refuse such credit - for the document, petitioner says, was for credit purposes only, not representing fact. Now, *163 however - after the invalidation in March 1944 - even if petitioner had in December 1939 actually thought the document was for credit purposes only, though contrary to the facts - he must either disclose to Wright that the document was no longer in legal existence, or be guilty - if he had before not been - of obtaining credit under false pretenses, unless he considered that his statement of December 8, 1939, declared the facts. He did not inform Wright of the invalidation by the court nor did the boys, who, petitioner would have us believe, at that time were taking full part in determining the policies and carrying on the partnership as full partners. We believe that the failure by petitioner and sons ever to notify Wright of the invalidation was due, not to intent to obtain by fraud the credit they continued to be extended by Wright in reliance on the December 8, 1939, declaration, but upon recognition by all that it stated the real and true situation. In addition, it is to be noted that though the boys knew of the document from the early part of 1943, no action was taken by or for them until February 23, 1944, to set it aside. For the greater part of a year they knowingly recognized *164 that document. Had Wright's company had occasion so to do, it might well have set up such recognition by the boys as a defense against any son then beyond majority. Most significant, however, is the fact that despite such knowledge in the early part of 1943 no action was instituted until after the issuance of the deficiency notice on December 17, 1943, with its denial of partnership. Only then did the sons take action to invalidate the document; and the record affirmatively shows this to be because it affected them income-taxwise. Thus do we see that not only did the parties take no action about the December 8, 1939, document until taxes impended, but for purposes of credit they let it continue in effect, in the mind of Wright, extending credit. We can not but think on all these facts that such procedure indicates, not fraud, but recognition of the situation as described in the document of December 8, 1939. That instrument is so careful to reserve away from the sons all right of participation in control and management of the business, or to invest the money derived from sales or earnings until the youngest arrives at the age of 21 years, that it sets forth the details of such provisions. *165 Participation in management and control is by the Supreme Court called a circumstance of prime importance, yet no son is by the instrument given any right of control or management except that the oldest surviving son should have such right, with his mother after the death of W. O. Culbertson, Sr., and after the death of both the latter and his wife the two oldest surviving sons should have management and control. No son had right to invest money from sales or earnings or to withdraw or to sell any part of his interest until the youngest was 21 years of age; and the consent of the sons was specifically made unnecessary to any transaction by the grantors, W. O. Culbertson, Sr., and wife. This instrument and "the partnership thereby created" was affirmed in one executed December 31, 1940, as in full force and effect at the latter date, at which time the minor daughter, Fannie, was brought into the matter and given an undivided one-eighth interest "subject to all the terms and conditions of the said trust instrument dated the 8th day of December 1939 * * *." Nothing in the record before us indicates that the latter instrument was taken up with Wright. To us it indicates a continued attitude *166 on the part of W. O. Culbertson, Sr., and wife that the "trust instrument by the terms of which a limited partnership was created" on December 8, 1939, as recited in the second instrument, set forth the facts as to partnership, as opposed to the contention that a general unrestricted partnership was originated orally on or about November 4, 1939. The instrument of December 8, 1939, specifically recites that it is "to become effective on the 1st day of January, A.D. 1940." Asked why that statement was made if a partnership was created in 1939, the petitioner answered "I don't know. No I don't." That date is consistent with the income tax return for 1940, for the latter also recited that date as the creation of the partnership; and Joe Jack referred to "along the first of the year when the partnership first started out * * *." In addition, the record fails to indicate to us that, even assuming something of oral agreement earlier, the instrument of December 8, 1939, does not encompass and express what was orally discussed, and intended from the beginning. We think that in fact, as indicated by Wright's testimony and statements by petitioner, W. O. Culbertson, Sr., "was forming," that *167 is, had not already formed, a partnership when Wright talked to him before December 8, 1939, and that the limited agreement there indicated represents reality. Petitioner's attempt to minimize the effect of the instrument of December 8, 1939, as one drawn by an attorney and not representing W. O. Culbertson, Sr.'s ideas is to us not convincing. Petitioner, asked "what about" language (in numbered paragraph 1) as to no necessity for sons' consent in any transaction, answered "We never exercised our rights to that at all." To us this appears as an inadvertent admission that he had in fact such rights. Petitioner testified that the instrument was read to him and that he understood it. He, in effect, reaffirmed it more than a year later. We believe that it represented his ideas of the factual situation at that time. The fact that the instrument of December 8, 1939, was later declared void, by a state court, in a collusive proceeding, is immaterial here, in our inquiry as to reality and intent in 1939-40-41 as to partnership. The recitations of the instrument of December 8, 1939, are altogether consistent with what later happened, for, as therein provided, W. O. Culbertson, Sr., did in *168 fact under the evidence have the general management and control, right of sale, and disposition of the business. (The fact that petitioner had favored buying the Baca ranch but the boys did not, and that it was not purchased, serves a little or nothing to indicate lack of control by petitioner. The reason for no purchase is never stated, and, though in control, petitioner would, of course, wish cooperation from his limited partners.) W. O., Jr., as salaried foreman, did, in effect, nothing more than he had previously done, for the same $1,200 salary, and the other boys, present only a small part of the time, did nothing of consequence, more than as sons they would reasonably do without partnership, or more than the limited partnership delineated in the December 8, 1939, instrument. In our view, the performance of routine farm or ranch work by the younger sons of the household, fairly to be expected of them as sons, is in logic little proof of such contribution of services as demonstrates partnership as opposed to mere filial duty; and the thought is particularly apropos here considering the small amount done by the boys in the taxable years when out of school, except W. O., Jr., a *169 paid employee. There is indication that the evidence of week-end work by the boys is overdrawn, for W. O., Jr., who lived at the ranch, says he contacted them when in town about every two weeks, whereas they claim to have worked practically every week-end on the ranch, 93 miles away. Joe Jack asked what in his opinion was his most important contribution to the partnership, designated the discussions and taking care of the breeding records. Yet these were all in the handwriting of W. O., Jr. Joe Jack apparently merely participated to some extent. That Richard was in the Army, of course, explains his situation. Moreover, even such services by the boys were paid for. In this connection we notice that there is little or no relation between the amounts received by the parties during the taxable years, and their status as alleged partners; for in 1940 "dividends" of $840 were received by petitioner and $902 "dividends" (in addition to salaries) received by the boys, while in 1941 petitioner received "dividend" of $1,900 and the boys' "dividends" were $2,450 in addition to salaries. On petitioner's theory, his "dividends" should have equalled those of the boys. The alleged equal terms of *170 "partnership" were thus plainly disregarded. Nor is there any consistency between the amounts received by the two younger boys for "salary" and the periods worked by them; for both worked for about $30- $35 a month. Yet in 1940 Joe Jack worked about 169 days and received $138 salary, while Eugene worked about 153 days but received only $94 salary. In 1941 Joe Jack worked about 84 days receiving salary of $106.66, and Eugene working about 148 days received "salary" of $93.32. All this seems to negative equal participation. There is indeed little in the record before us to indicate that the partnership, for which petitioner contends from the bill of sale and note (which, of course, of themselves do not establish partnership) and oral conversations, is not that which was represented to Wright on December 8, 1939. The general idea of equal division, therein entailed, may well have been that described subject to conditions in the document of December 8, 1939. No witness denied that the document set forth the partnership agreement, or testified that the "partnership" contended for was not subject to terms and conditions as expressed in that instrument. True, the petitioner replied "I *171 did not" to a question framed as follows: Q. Mr. Culbertson in executing this document of December 8, 1939, did you intend to qualify or change anything that had heretofore existed between yourself and your sons? and gave the same answer to: Q. Did you intend to change this ownership of the cattle? But this is equivocal language. If the situation and previous ownership were as described in that instrument, of course he did not change it or intend to do so; and that the purpose of the instrument was to establish credit, not only does not negative truth stated in it, but, unless fraud was in mind, is highly indicative that truth was expressed. It is a noticeable fact here that only in inference do we find evidence of denial of limited partnership. Even without reference to any principle of close scrutiny of family matters, logic indicates the necessity of positive denial that there was a limited partnership with conditions as described on December 8, 1939. It does not appear. Neither petitioner nor any son testified that their alleged ownership was not subject to the control conditions and restrictions described on December 8, 1939. That the boys "felt" that they were "real" *172 partners, and that W. O., Jr., and Richard felt that they could withdraw, does not furnish such denial. A limited partnership is real. In the presence of such document, and in the absence of such denial, reason requires reconciliation of the use of "partnership" as contended for, with limited and conditional partnership as provided in the document. We believe that the agreement was not the absolute partnership sought, but subject, under all of the facts before us, to terms and conditions prescribed, and truthfully described on December 8, 1939, by the petitioners, donors to the boys, and that they passively acquiesced therein. Among other facts, not specifically above discussed, which have entered into our consideration on this matter are: That W. O. Culbertson & Sons applied for and secured a brand for its cattle in October 1940; that though W. O., Jr., performed regular and no doubt onerous services for the organization, including purchasing supplies and participating to some extent in cattle deals, such services appear within the ambit of his paid duties as manager or overseer, as to which, he testified, his actual work had not changed from his previous overseership with Coon *173 & Culbertson; that after the alleged formation of partnership Coon & Culbertson, not W. O. Culbertson & Sons, sometime after January 1, 1940, sold cattle for which the boys had on January 1, 1940, given their note, thus indicating the control of the father (consistent with the instrument of December 8, 1939) and that the note of November 4, and bill of sale of November 6, were subject to the same control. Though the record does not show a bill of sale as to these cattle, as to those on November 4, that is the usual method of transfer of personalty, the cattle were "put into the partnership," and the boys clearly, on petitioner's theory, owned them. This transaction detracts much from the weight of the bill of sale and note of November 4, for since the ownership of the boys, after they had given their note, to the extent of several thousand dollars for additional cattle, meant so little that Coon & Culbertson sold them, then the note and bill of sale of November 4 and 6 can hardly be considered to have meant more to the parties and to be an absolute conveyance. We have considered also that the fact that though present and active throughout the years in question W. O., Jr., wrote only *174 five checks, in very small amounts; that though on advice of counsel petitioner did not contend at trial herein that Fannie, aged 14 in 1940, was a partner (though the petition so alleges as to 1941), he actually so considered her, and "sold" her an eighth interest in the partnership on December 31, 1940, though he later made her a gift of her note, thus indicating not only the petitioner's desire to divide with all of his children (regardless of contribution, as is borne out by failure to contend that Fannie, aged 15, made contribution of either services or capital), but also, as the instrument recites, that Fannie received an interest only subject to the limitations and conditions set forth in the document of December 8, 1939 - yet the conveyance to her was of an eighth "interest in such partnership" and in the property of the "copartnership of W. O. Culbertson & Sons" showing that petitioner then regarded that document as setting up the copartnership; that though the decree of the District Court of Dallam County invalidates the December 8, 1939, declaration, it recognizes and declares Fannie to be a partner - though she took under the December 8, 1939, instrument; that there is *175 no showing that any of the sons, except W. O., Jr., ascquiesced in or were notified of petitioner's inclusion of Fannie in the partnership; [3] that, of course, such admission into partnership is a matter of agreement by all partners, so that there is again indication of the control by the father; that the intent and agreement that the boys should finish high school and college, and that this was in large part done, is consistent with the intent expressed in the instrument of December 8, 1939, that petitioner retain control, and that he desired to establish them in business "as and when they arrive at a proper age to engage in business"; that the partnership accounts were later set up "as of" October and November 1939; that Richard's sale of his interest in the partnership properly was in 1947, the year in which Fannie became 21 years of age, and that no disposition of partnership interest by a child appears earlier - all in accord with the condition of the document of December 8, 1939, that no son could sell until the youngest reached 21 years of age, which applied to Fannie under the instrument conveying to her on December 31, 1940. Had any child sold before the youngest reached 21, *176 the petitioner would logically rely on that fact, so that the opposite is of significance. Taking the view under all of the facts before us that the instrument of December 8, 1939, represents the agreement as it actually existed, we find it to be insufficient within the purview of the opinion of the Supreme Court in this case, and of the Clifford, Horst, and Tower cases, supra. It specifically kept from the sons any control of property or earnings until the youngest became 21 years of age. The intent that they should have the management and control of the property conveyed to them, in the future when the youngest became 21 years of age, does not, in our view, demonstrate that under section 22(a) of the Internal Revenue Code the sons earned the income which the petitioners ascribe to them. We think W. O. Culbertson, Sr., earned it. In the course of its opinion, the Supreme Court pointed out the first principle of income taxation: that income must *177 be taxed to him who earns it. Lucas v. Earl, 281 U.S. 111; Helvering v. Clifford, supra; National Carbide Corporation v. Commissioner, 336 U.S. 422. The Court states that Commissioner v. Tower, supra, clearly indicates the importance of participation in the business by the partners during the tax year. Again, it is noted that the existence of the family relationship is simply a warning that things may not be what they seem and makes it possible for one to shift tax incidence by surface changes of ownership without distributing dominion and control, but that if the donee of property invested in a family partnership exercises dominion and control over the property, thus influencing the conduct of the partnership and the disposition of its income, he may be a true partner; and that whether he is free to and does enjoy the fruits of partnership is strongly indicative of reality of his participation. Distinction is noted between active participation by such donee, and passive acquiescence to the will of the donor. Participation in control *178 and management of the business of the ranch is said to be included as a circumstance indicative of intent to carry on business as a partner, to cover the situation in which active dominion and control of the subject of the gift had actually passed to the donee. As we see this matter, there was passive acquiescence by the sons in the will of the donor, their father, [4] in his general management of the cattle business; the earnings were his and they were not the true owners, within the cases above cited, of the cattle mentioned in the agreement of December 8, 1939. We find in the facts lack of freedom in the sons to enjoy the fruits of the arrangement and that the sons were not in reality participating in more than a limited partnership enterprise. Capital accounts were not set up for them. There is no showing that they ever received their shares of the income, except that they "drew a little money along for expenses or living expenses," and received some small dividends and, in 1941 only and not in 1940, much smaller "Payments for Account." The terms of the instrument of December 8, 1939, would, of course, explain any receipt of moneys by the boys, equally with the alleged earlier oral *179 agreement, and equally explain the references to partnership. It would satisfy Coon's idea that the sons have an interest for the record does not justify conclusion that he designated the particular nature of their ownership and his relations with petitioner would seem to negative distrust of petitioner as to just how he would have the sons help carry on. Nothing of record shows whether or not the partnership profits went into payment of family expenses during the taxable years. We believe that this is a case where the dominion and control over the subject of the gift to the sons - and they never at any time personally paid anything for the cattle - remained in the father, as well as the dominion and control of the income therefrom, and that the petitioner at all times retained "the substance of full enjoyment" of previous rights. The desire of petitioners, as expressed on December 8, 1939, to establish their sons in business "as and when they arrive at proper age" does not comply with what the Supreme Court in this case said as to present contribution as against intent to so contribute in the future. This was, in our view, a surface change of ownership without disturbing control over *180 property or income. We conclude and hold upon all of the facts that it was not the intent of the petitioners and their sons, or any of them, in good faith to become partners in the cattle business during the taxable years, within the principles enunciated in the above cited cases, which we need not restate. We, therefore, hold that there was no error in ascribing the income of the alleged partnership to the petitioners. Though the petitioner on brief urges in the alternative the income should be devided equally, according to ownership, under the bill of sale of November 4, 1939, that instrument has, as above seen, been considered and is found, in the light of all the evidence, not to represent an absolute conveyance. Moreover, we have before us no sufficient evidence upon which to compute income upon basis of ownership alone, with management and control, as we have found, in the petitioner. Success in the cattle business requires, in addition to partnership, experience such as petitioner had. Louis Visintainer, 13 T.C. 805, where, as here contended, a father conveyed sheep to minor children, but managed the business. The petitioner's alternative is, therefore, denied. *181 He asks then that if all income is ascribed to the petitioners, they are entitled to dependency credits within the statute. We agree, and it has been stipulated, that credit should in such case be allowed for two dependents. Decisions will be entered under Rule 50. Footnotes
1. This finding modifies the statement in findings after the original hearing that books were set up October or November 1939.↩
2. The instrument of December 31, 1940, five times calls that of December 8, 1939, a "trust instrument," and refers to it as making a "conditional conveyance" to the sons, and a limited partnership.↩
3. The evidence is inconclusive. He said something was said about it but that he did not know she was made a partner.↩
4. Asked why he did not tell the boys about the document of December 8, 1939, W. O. Culbertson testified "I didn't think they'd be concerned in it," and didn't think they'd be interested in knowing that he drew it up for the purpose of establishing a line of credit for them. This is consistent also with the exclusive management reserved to W. O. Culbertson, Sr., in the instrument.↩